UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

FELICIA ALTERESCU,

                                        Plaintiff,

                -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION; RICHARD CARRANZA,
CHANCELLOR; and THE UNITED FEDERATION
OF TEACHERS,

                                        Defendants.

------------------------------------------------------------------- x

21-CV-00925 (KPF)

**DECLARATION OF
LAUREN A.
ROSENFELD IN
SUPPORT OF DOE
DEFENDANTS' MOTION
TO DISMISS
PLAINTIFF'S SECOND
AMENDED COMPLAINT**

        **LAUREN A. ROSENFELD**, declares, under penalty of perjury and pursuant to 28

U.S.C. § 1746, that the following is true and correct:

        1.      I am an Assistant Corporation Counsel in the Office of Georgia M. Pestana,

Corporation Counsel of the City of New York, attorney for the Defendants, New York City

Department of Education and Richard Carranza ("collectively DOE Defendants") in the above-

captioned action. As such, I am familiar with the facts set forth herein.

        2.      Indexed hereto are true and correct copies of the following documents

Exhibit A:      New York State Supreme Court's decision in <u>Matter of Alterescu v.
                Dep't of Educ. of the City Sch. Dist. of the City of N.Y.</u>, 2019 NY
                Slip Op 30476(U) (Sup. Ct. 2019), dated February 25, 2019;

Exhibit B:      Hearing Officer determination, dated June 1, 2018; and

Exhibit C:      Chancellor delegation letter, dated May 2, 2018;

WHEREFORE, DOE Defendants' respectfully request that this Court grant their motion and dismiss the Second Amended Complaint in its entirety, with costs, fees, and disbursements.

Date:        New York, New York
             October 6, 2021

> **GEORGIA M. PESTANA**
> Corporation Counsel of the
> City of New York
> Attorney for DOE Defendants
> 100 Church Street, Room 2-109(C)
> New York, New York 10007
> (212) 356-3574
> lrosenfe@law.nyc.gov
>
>
> By:    /s/ *Lauren A. Rosenfeld*
>                 _____
>          Lauren A. Rosenfeld
>          Assistant Corporation Counsel

**EXHIBIT A**

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT:  **HON. JOHN J. KELLEY**

*Justice*

--------------------------------------------------------------------X

In the Matter of

FELICIA ALTERESCU

Petitioner,

- v -

THE DEPARTMENT OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK,

Respondent.

--------------------------------------------------------------------X

| | |
|---|---|
| PART | **IAS MOTION 56EFM** |
| **INDEX NO.** | 653007/2018 |
| **MOTION DATE** | 07/11/2018 |
| **MOTION SEQ. NO.** | 001 |

**DECISION AND ORDER**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33

were read on this motion to/for          VACATE - DECISION/ORDER/JUDGMENT/AWARD          .

In this CPLR article 75 proceeding, the petitioner seeks to vacate an arbitrator's award, made after a compulsory arbitration, that sustained charges of chronic absenteeism and delinquency, and thereupon terminated her position as a public-school teacher with the respondent, New York City Department of Education (hereinafter the DOE). The DOE cross-moves pursuant to CPLR 3211(a)(7) to dismiss the petition for failure to state a cause of action. The cross motion is denied. The petition is denied and the proceeding is dismissed.

The petitioner, Felicia Alterescu, was a teacher at Public School 32 in Flushing. The DOE preferred five charges against her pursuant to Education Law § 3020-a, alleging that she engaged in misconduct during the 2016-2017 school year, secifically: (1) that she failed to attend a parent-teacher conference on March 9, 2017; (2) that she lied about her whereabouts during that conference; (3) that she failed to attend eight professional learning-time meetings during spring 2017; (4) that she failed to punch her time card when arriving late to school on three occasions; and (5) that, by committing these violations, the petitioner created an undue burden on the school.

653007/2018  ALTERESCU, FELICIA vs. DEPARTMENT OF EDUCATION          Page 1 of 6
Motion No.  001

1 of 6

The charges, which were the subject of compulsory arbitration, as mandated by

Education Law § 3020-a, were heard by an arbitrator.  After a hearing, arbitrator Mary J.

O'Connell issued a 35-page Final Opinion and Award dated June 1, 2018, sustaining all of the

charges, and recommending termination of the petitioner's employment as a penalty, based on

her findings in connection with Charge Nos. 1 and 3.  The petitioner commenced this

proceeding pursuant to CPLR Section 7511(b) to vacate the award, arguing that the finding of

misconduct was arbitrary and capricious and that the penalty imposed was disproportionate to

the offense committed, thus constituting an abuse of discretion as a matter of law.

Education Law § 3020-a(5) provides that judicial review of the findings made by a

hearing officer or arbitrator after an arbitration hearing must be conducted pursuant to CPLR

7511.  Under this provision, an award may only be vacated upon a showing of "misconduct,

bias, excess of power or procedural defects" (*Matter of Austin v Board of Educ. of City Sch.*

*Dist. of City of N.Y.*, 280 AD2d 365, 365 [1st Dept 2001]).  Nevertheless, where, as here, the

parties have submitted to compulsory arbitration, judicial scrutiny is stricter than that for a

determination rendered where the parties have submitted to voluntary arbitration (*see Matter of*

*Motor Veh. Acc. Indem. Corp. v Aetna Cas. & Sur. Co.,* 89 NY2d 214, 223 [1996]*; Matter of*

*Lackow v Department of Educ. of City of New York*, 51 AD3d 563, 567-568 [1st Dept 2008]

[citations omitted]).  Thus, the determination must be in accord with due process, must be

supported by adequate evidence, and must be rational and satisfy the arbitrary and capricious

standard of CPLR article 78 (*see Matter of Lackow v Dept. of Educ. of City of New York*, 51

AD3d at 567).  The party challenging an arbitration determination has the burden of showing its

invalidity (*see id.* at 568*; see also Matter of Dikovskiy v New York City Bd. of Educ.*, 157 AD3d

501, 501-502 [1st Dept 2018]; *Matter of Asch v New York City Bd./Dept. of Educ.*, 104 AD3d

415, 418-419 [1st Dept 2013]).

653007/2018   ALTERESCU, FELICIA vs. DEPARTMENT OF EDUCATION
Motion No. 001

Page 2 of 6

2 of 6

Case 1:21-cv-00925-KPF   Document 25   Filed 10/06/21   Page 6 of 48

Contrary to the DOE's contention, the petition states a cause of action. When assessing the adequacy of a complaint in the context of a CPLR 3211(a)(7) motion to dismiss, the court's role is "to determine whether plaintiffs' pleadings state a cause of action" (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 151-152 [2002]). On such a motion, the pleading is to be afforded a liberal construction, the facts alleged in the complaint must be deemed true, and the plaintiffs must be accorded the benefit of every possible favorable inference (*see id.; see also Romanello v Intesa Sanpaolo, S.p.A.*, 22 NY3d 881, 887 [2013]; *Simkin v Blank*, 19 NY3d 46, 52 [2012]; CPLR 3026). "The motion must be denied if from the pleadings' four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law" (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d at 152 [internal quotation marks omitted]; *see Romanello v Intesa Sanpaolo, S.p.A.*, 22 NY3d at 887; *Leon v Martinez*, 84 NY2d 83, 87 [1994]; *Guggenheimer v Ginzburg*, 43 NY2d 268, 275 [1977]). Thus, the court should determine only whether the facts as alleged fit within any cognizable legal theory (*see Leon v Martinez*, 84 NY2d at 87-88). Here, the petitioner has met this liberal standard of pleading by contending that the compulsory arbitration award was arbitrary and capricious and that the resulting penalty was disproportionate to the offense.

Where, as here, the court considers evidentiary material beyond the petition, the criterion becomes "whether the proponent of the pleading has a cause of action, not whether he [or she] has stated one" (*Guggenheimer v Ginzburg*, 43 NY2d at 275), but dismissal will not eventuate unless it is "shown that a material fact as claimed by the pleader to be one is not a fact at all" and that "no significant dispute exists regarding it" (*Id.*). The DOE argues that the petitioner's own admissions concerning her whereabouts during the meetings in question confirm that she did not perform her duty, and thus defeat the allegations in the petition. The validity and credibility of those excuses, however, presented only evidence to be weighed by the arbitrator. The DOE has therefore failed to demonstrate that a material fact claimed by the

653007/2018   ALTERESCU, FELICIA vs. DEPARTMENT OF EDUCATION          Page 3 of 6
Motion No. 001

3 of 6

pleader is not a fact at all and that there is no significant dispute over it.  Hence, the cross

motion to dismiss the petition must be denied.

While denial of the motion generally would require a respondent to serve an answer,

under the circumstances presented here, there is no need for the DOE to answer, as the facts

have been fully presented in the parties' papers, no factual dispute remains, and the DOE will

not be prejudiced if it doesn't file an answer (*see Matter of Nassau BOCES Cent. Council of

Teachers v Board of Coop. Educ. Servs. of Nassau County*, 63 NY2d 100 [1984]; *Matter of

Applewhite v Board of Educ. of the City Sch. Dist. of the City of N.Y.*, 115 AD3d 427 [1st Dept

2014]; *Matter of Camacho v Kelly*, 57 AD3d 297 [1st Dept 2008]).  Thus, upon denying the cross

motion to dismiss, the court will consider the merits of the petition.

The petition must be denied.  An arbitration award is considered arbitrary and capricious

when it is made "without sound basis in reason or regard to the facts" (*Matter of Peckham v

Calogero* 12 NY3d 424, 431 [2009]; *see Matter of Pell v Board of Educ.* 34 NY2d at 231).  Thus,

the court must determine whether there was a rational basis in the record that supports the

arbitrator's decision (*see Matter of Eilenberg v City of New York*, 2017 NY Misc LEXIS 223, *5

[Sup Ct, N.Y. County, Jan. 18, 2017]).  Here, there is ample evidence in the record to support

the arbitrator's determination.  Although the petitioner contends that she did not attend the

parent-teacher conference because she had not been specifically assigned to attend it, the

record reflects that, although she was present at the school when the conference was

conducted, she did not ask anyone where she should report, as she was required to do.  The

petitioner's contention that it was sufficient under school policy to merely be at the premises

during the conference was contradicted by the principal's testimony; therefore, it was rational for

the arbitrator to conclude that petitioner was inappropriately absent for not reporting to the room

where the conference was taking place.  Furthermore, the petitioner's claim that she did not

have notice about her duty to attend the professional learning-time meetings is contradicted by

testimony that she was reminded firmly of the place and time of those sessions.  Because an

653007/2018  ALTERESCU, FELICIA vs. DEPARTMENT OF EDUCATION
Motion No.  001

Page 4 of 6

4 of 6

Case 1:21-cv-00925-KPF   Document 25   Filed 10/06/21   Page 8 of 48

arbitrator or hearing officer observes the witnesses and generally is in a better position to determine credibility issues, his or her credibility determinations "are largely unreviewable" (*Lackow*, 51 AD3d at 568, quoting *Matter of Berenhaus v Ward*, 70 NY2d 436, 443 [1987]). The court must thus defer to the arbitrator in connection with these findings. Hence, the finding of misconduct based on chronic absenteeism is not arbitrary and capricious.

"The standard for reviewing a penalty imposed after a hearing pursuant to Education Law § 3020-a is whether the punishment of dismissal was so disproportionate to the offenses as to be shocking to the court's sense of fairness" (*Matter of Lackow v Dept. of Educ. of City of New York*, 51 AD3d at 569; *see Matter of Harris v Mechanicville Cent. School Dist.*, 45 NY2d 279, 285 [1978]; *Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 313 NE2d 321, 356 NYS2d 833 [1974]; *see Matter of Kreisler v New York City Tr. Auth.*, 2 NY3d 775, 776 [2004]; *Matter of Featherstone v Franco*, 95 NY2d 550, 554 [2000]).

The penalty of termination from employment does not shock the judicial conscience and is not disproportionate to the petitioner's misconduct. The arbitrator reasonably found that the misconduct was part of a pattern of behavior. The court rejects the petitioner's argument that the misconduct here is unlike prior misconduct, which included her failure to meet required pedagogical standards and her abuse of sick days. On the contrary, the required professional learning-time meetings that she failed to attend were part of her plan of assistance intended to cure pedagogical deficiencies. Even standing alone, these absences could be considered sufficient to constitute a neglect of duty and conduct unbefitting a professional. The petitioner was on notice, based on previous disciplinary penalties--- including suspension---that further misconduct could result in termination of her employment. Thus, the termination of the petitioner's employment was not disproportionate to the offenses committed.

The petitioner's remaining contentions are without merit.

Accordingly, it is,

653007/2018   ALTERESCU, FELICIA vs. DEPARTMENT OF EDUCATION                    Page 5 of 6
Motion No. 001

5 of 6

ORDERED that the respondent's cross motion to dismiss the petitioner is denied; and it is,

ORDERED that the petition is denied; and it is,

ADJUDGED that the proceeding is dismissed.

This constitutes the Decision, Order, and Judgment of the Court.

2/25/2019
**DATE**

JOHN J. KELLEY, J.S.C.

**HON. JOHN J. KELLEY**
**J.S.C.**

| CHECK ONE: | X | CASE DISPOSED | | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|
| | | GRANTED | X DENIED | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | | REFERENCE |

**653007/2018   ALTERESCU, FELICIA vs. DEPARTMENT OF EDUCATION**
**Motion No. 001**

Page 6 of 6

**EXHIBIT B**

NEW YORK STATE EDUCATION DEPARTMENT
-----------------------------------------------------------------------X
In the Matter of the Charges preferred by                    )
                                                             )
DEPARTMENT OF EDUCATION OF THE                               )
CITY OF NEW YORK,                                            )
                                                             )
                "Complainant-Employer"      )
                                                             )
        -against –                            )          SED Case No. 32418
                                                             )
FELICIA ALTERESCU                                            )
                                                             )
           "Respondent-Tenured Teacher"   )
                                                             )
Pursuant to Education Law Section 2590 (j) (7)               )
And Section 3020(a).                                         )
-----------------------------------------------------------------------X


APPEARANCES

      For the Department

             Howard Friedman, Esq., General Counsel to the Chancellor
             By:  Catherine Sam, Esq.
                 Susan Jalowski, Esq.

      For the Respondent

             Robert T. Reilly, Esq.
             By:  Keith J. Gross, Esq.


BEFORE

      Mary J. O'Connell, Esq., Hearing Officer

## BACKGROUND

The Department preferred Charges against Respondent, Felicia Alterescu a tenured teacher assigned to the Absent Teacher Reserve ("ATR"). By notice from the New York State Education Department, I was appointed Hearing Officer.

A prehearing conference was held on January 16, 2018. At that time, any outstanding issues concerning discovery were resolved.

Hearings on the Specifications against Respondent took place on March 27, 2018, April 9, 2018, April 16, 2018, April 20, 2018, April 25, 2018 and April 30, 2018 at the offices of the Department in New York, New York. The parties took full opportunity to introduce evidence and argument in support of their respective positions. A stenographic record of the hearing was taken. At the close of the hearing, the record was declared closed pending my receipt of the hearing transcript. All of the parties' arguments have been fully considered in the rendering of this opinion, even if not specifically referenced.

## DISCUSSION AND FINDINGS

### The Specifications

The Specifications against Respondent read as follows:

## SPECIFICATIONS

**Felicia Alterescu** (hereafter referred to as Respondent), under File # 0675538, is a tenured teacher assigned to the Absent Teacher Reserve ("ATR") in Queens.

During the 2016-2017 school year, Respondent engaged in misconduct, insubordination and neglected her duties as follows:

## In Particular:

**SPECIFICATION 1:** On or about March 9, 2017, Respondent failed to attend the Parennt Teacher Conference.

**SPECIFICATION 2:** On or about April 4, 2017[1], Respondent falsely stated that she was present in the auditorium during Parent Teacher Conference when she was not.

**SPECIFICATION 3:** Respondent failed to attend approximately eight (8) Monday Professional Learning Time meetings at Public School 32, in Queens, on the following dates:

1) February 6, 2017
2) February 13, 2017
3) February 27, 2017
4) March 6, 2017
5) March 13, 2017
6) March 20, 2017
7) March 27, 2017
8) April 3, 2017

**SPECIFICATION 4:** During the month of March of 2017, Respondent failed to punch her time card on approximately three (3) occasions when arriving late to school on the following dates:

| DAY | DATE |
| --- | --- |
| 1) Thursday | March 2, 2017 |
| 2) Monday | March 6, 2017 |
| 3) Tuesday | March 7, 2017 |

**SPECIFICATION 5:** By committing one, some or all of the actions described in Specifications 1-4, Respondent created an undue burden on the school and/or staff and/or prevented Respondent from service and/or growth as a teacher and/or had a disruptive and/or negative impact on his (sic) workplace.

## The foregoing constitutes:

- Just cause for disciplinary action under Education Law Section 3020-a;
- Neglect of duty;
- Conduct unbecoming Respondent's position, or conduct prejudicial to the good order, efficiency, or discipline of the service:
- Insubordination;

---

[1] At the hearing the Department moved to amend this specification to correct a typographical error in the date. The motion was granted without objection. T. 31. Therefore, the date in Specification 2 should read March 9, 2017.

- A violation of the by-laws, rules and regulations of the Chancellor, Department School or District;
- Substantial cause that renders Respondent unfit to perform his (sic) obligations to the service; and
- Just cause for termination.

(DOE Exhibit 1)

**Positions of the parties**

The Department argues that this is the fifth time the Respondent has been brought up on disciplinary charges. This case, like the others, concerns her putting her interests before those of the Department, her colleagues, parents and students. She has failed to live up to the expectations of a New York City teacher, and the Department has proven the charges by a preponderance of the credible evidence.

The Department submits that, as to Specification Four, Principal Errico truthfully testified that the Respondent had developed a pattern of lateness. Thus, it stands to reason that Principal Errico would have directed her to punch in. She recalled having a conversation with Assistant Principal Stark and was told the Respondent could be required to punch in. Ms. Scoufaras, the payroll secretary, also testified truthfully that she knew the Respondent had been asked to punch in. AP Stark testified that the Respondent was not present when he arrived at the school at 8 am one day. It is the Department's position that the visitors log does not include every single day that AP Stark visited the school. It does not undermine the credibility of AP Stark. He made clear that he met with the Respondent and was notified of her lateness sometime before the February break, which was also consistent with the time she started punching in on February 14. Her lateness created an undue burden on the school and staff and had a disruptive and negative impact on the workplace.

As to Specifications One and Two, the Department maintains that there is no reason to

4

think that the Respondent would not know that it was parent-teacher conference night, as she had admitted that it was an important night on the school calendar. Further, the Respondent being in the auditorium is not attendance.   It is not helping in a meaningful and substantial manner.   The April 6, 2017 disciplinary letter (Department Exhibit 5) is not an admission that the Respondent was present. The Principal was reiterating what the Respondent said.

The Department further submits that we know that the Respondent was not in the auditorium during the evening session.  The Respondent's alibi witness testified that he was not in the auditorium.

As to not receiving direction, two paraprofessionals testified that they would take the initiative to help out any way they could. The Respondent was not engaging, not asking how she could help.  Being in the auditorium reading a book is not being a help to the school.  There is no reason for her to have been in the auditorium in the evening. The Department submits that she lied about being there. Not one person could verify that she was in the auditorium.  Instead, Principal Errico testified that as she passed the auditorium, the door was closed and the lights were off.

The Department submits that the impact of the Respondent not attending the Parent Teacher Conference was that she failed to be present and supportive to the school.

Specification Three, in the Department's view, is about taking initiative as an adult and as an employee of the agency. Professional development is an essential piece of the teacher's pedagogy.  The Respondent admitted that the professional development covered the Danielson Framework. The Department notes that the Respondent's plan of assistance required the Respondent to attend professional development at her assigned school.  The activities that the Respondent testified she engaged in - reading a book or writing a lesson plan - were never

mentioned in the Respondent's rebuttal letter or in the recordings of the disciplinary meetings.

The Department contends that the issue is not whether Principal Errico saw the Respondent reading a book and told her to go to professional development. The Respondent is a twenty-five year Department employee. She knows or should know what is expected of her. The Department should not have to spoon feed individuals who have been working for the agency for a long time. It is important to note that despite saying she wanted a permanent position, the Respondent did not avail herself of professional development, a contractually mandated time to improve her skills. As to the Respondent's contention that not all the teachers signed in each week, the Department maintains that this case is not about other teachers.

The Department also points out that AP Stark testified that the expectations for teachers in the ATR are the same as for any other teacher. If there was any issue with regard to professional development, the Respondent could have reached out to him, but there is no evidence that she did so. Why did she not tell him about the lack of direction concerning professional development? The Department argues that she never did because she never wanted to go in the first place. The Respondent had a duty and obligation to take the initiative to get the information she needed. The Department contends that the burden is on the Respondent to seek out information about professional development. She was capable of asking for information as to other things, but she failed to do so for professional development or parent teacher conferences.

As to impact, by failing to attend professional development, she had a negative impact on her workplace and prevented her own improvement as a teacher.

The Department counters the Respondent's argument that Principal Errico was unfriendly by asking the hearing officer to listen to the audio and note the principal's demeanor at the hearing. The Department maintains that Principal Errico was someone who was being patient

and trying to explain the rules.

The Department argues that even if the payroll secretary told her to sit in the teachers' lounge, the Respondent knew that professional development sessions were not occurring there, so why did she continue to sit there week after week?  This easy way out sets a bad example for students. The Respondent was not set up to fail, but did so by her own decisions.  She never availed herself of opportunities to improve her pedagogy.

As to the Respondent's credibility, the Respondent had previously been found guilty of lying to the Department and that casts a dark shadow on her credibility in this case. The Department points to the Respondent's testimony of what the payroll secretary told her. The payroll secretary rebutted that testimony by stating that she would not have made that decision - she would have gone to the assistant principal.  As to the assertion that Mr. Hoffman could verify her presence at the Parent Teacher Conference, the Respondent never clarified who she or her union representative were referring to in her rebuttal letter, or at the conferences. She never addressed the inconsistencies in her narrative.  Further, her testimony concerning punching in was illogical.  The Department submits that the Respondent, aware of time and attendance issues, was calculated in her actions when she did not clock in on March 2, March 6 and March 7. The Respondent further denied that she stated at the disciplinary meeting that at every other prior school she was told to be in the building or in the teachers' lounge, even when confronted with the audio. The Respondent wanted to hide the fact that she had not been told at her prior schools to defy a Department obligation and just relax in the teachers' lounge. All the rebuttal witnesses testified that she was told no such thing.

The Department also maintains that double jeopardy does not apply to administrative proceedings, citing Matter of John Grinse v. New York City Board of Education and Department

of Education v. J.A. Here, the Respondent was never disciplined for her lateness. The Department also maintains that the cases cited by the Respondent are not on point.

The Department argues that the Respondent cannot be remediated.  All the steps of progressive discipline have taken place, citing prior settlements and arbitrators' decisions. The Department also cites the cases of Ambach v. Norwich, 441 US 68 (1979) which stands for the proposition that teachers serve as role models, and Bott v. Board of Education, 41 NY2d 265, which states that the purpose of 3020-a is to determine if the employee is fit to carry on his professional responsibilities. As to penalty, the Department submits the case of DOE v. J.K, concerning repeated failure to attend professional development, as well as DOE v. P.Q.C. The Department offers these cases in support of the proposition that not attending professional development is serious.

The Department submits that it has proven the Respondent's egregious conduct, and that the charges must be sustained and the Respondent terminated.

The Respondent contends that the Department has failed to prove facts necessary to sustain Specifications One, Two and Four, and asks that those Specifications be dismissed. Moreover, as to Specification Three, the Respondent acknowledged that she did not attend professional learning sessions on certain days, but the evidence shows that this is not a disciplinary issue.  Since Specification Five is contingent upon the Department proving the other four specifications, it too, should be dismissed.

Turning to Specifications One and Two, the Department did not and cannot show that the Respondent failed to attend the evening Parent Teacher Conference on March 9, 2017. In Department Exhibit 5, the April 6, 2017 letter, the principal wrote: "During parent-teacher night, you failed to engage in any action related to the evening events instead secluding yourself with a

book in an area where teachers and parent were not located." In the recording (Respondent Exhibit 15), the principal also seemed to acknowledge, after the Respondent explained her side of the story, that the Respondent was at the school. Further, Respondent Exhibit 14, the March 15, 2017 recording shows that the assistant principal saw the Respondent at the end of the evening. This would confirm that the Respondent was in attendance during the evening session. The assistant principal's testimony that he could not recall seeing the Respondent does not rebut the evidence presented. If the Respondent had not seen the assistant principal on March 9, 2017, the administration would have raised that information at the April 4, 2017 disciplinary conference. It did not. Department Exhibit 5 demonstrates that the principal credited the explanation. Further, Principal Errico testified that she did not specifically look for the Respondent and that she may have been sitting in the auditorium in the dark. None of the Department's witnesses refuted that the Respondent was in the auditorium during the conference.

The Respondent contends that Specification Two is counter-intuitive. If she was not in attendance at the March 9, 2017 conferences how could she have told someone at the school that she was in the auditorium?

Finally, Specifications One and Two should be dismissed because the failure to attend the Parent Teacher Conference was not deemed a disciplinary issue. The recording (Respondent Exhibit 14) shows that the meeting was formal and official, thereby indicating that there would not be a disciplinary conference with Principal Errico. The e-mail AP Stark sent on March 15, 2017 discussed two issues, punching in and lesson plans. Contrary to the principal's claim, AP Stark testified that he did follow up with the principal about the March 9, 2017 evening session. This discussion and the absence of any mention of the issue in the March 15, 2017 e-mail is indicative of the fact that they did not believe it was a disciplinary issue. Moreover, there was

9

no disciplinary summons issued to the Respondent in advance of the April 4, 2017 meetings, referencing Respondent Exhibit 3 regarding the Professional Learning Time, and Department Exhibit 18 concerning time and attendance. Therefore, the overall circumstances indicated that the March 9, 2017 evening Parent Teacher Conference was not viewed as a basis for discipline and thus cannot justify disciplinary action.

As to Specification Four, the Respondent testified that she was not late on March 2, March 6, and March 7. This corresponds to Respondent Exhibit 4: EIS records which indicated no lateness in March, 2017. The Respondent explained she was not required to punch in prior to March 15, 2017. Respondent Exhibit 15 also demonstrates that the Respondent was not required to punch in as of March 8, 2017. Both the Principal and AP Stark were at the April 4, 2017 meeting, and neither refuted the statement. The recording shows that AP Stark stated that the Respondent successfully punched in during the month of March as directed. The Respondent further notes that the payroll secretary could not say whether the Respondent was late for the days in question. Nor was AP Stark present on those dates per the log book.

Moreover, the specification requires that the Department prove that the Respondent was required to punch her timecard but the credible evidence demonstrates that the Respondent was not required to punch in if she was late, citing the March 15, 2017 e-mail as well as the testimony of Principal Errico. The Respondent further maintains that the evidence, specifically the school's visitor's log, shows that AP Stark could not have had a conversation with the Principal during a visit to the school to discuss punching in prior to the February break because the visitor's log demonstrated that he was at the school on February 6 and not again until March 10. The evidence shows that on March 8, the principal e-mailed AP Stark saying she needed help with the Respondent. AP Stark visited on March 10. AP Stark indicated that a few days after the

meeting with the principal, he met with the Respondent. That meeting was the March 15, 2017 disciplinary conference. It was only after the written directive was issued that the Respondent was to punch in.

Finally, at the March 15, 2017 conference the Respondent was given a warning and directed to punch in. For the Department to penalize the Respondent now would constitute double jeopardy. The prohibition against double jeopardy has been recognized in 3020-a proceedings, citing DOE v. A.G, SED No. 4094, DOE v. E.D., SED No 4232 and DOE v. D.S., SED No. 3611. The Respondent maintains that the Department has already exacted a disciplinary measure for the alleged issues in Specification Four. The Department cannot litigate the previously resolved issues and is barred as a matter of law from attempting to extract a second penalty.

As to the Department's rebuttal witnesses, it is not that they said things did not happen. It was that they did not recall. In addition, the Respondent did not say specifically that it was the principals who told her what, if anything, to do during a professional development assignment.

The Respondent maintains that there are several examples in the record of Principal Errico giving misleading statements. For example, she stated that the Respondent had been added to the teacher list serve, and then walked that statement back. Her testimony as to how she learned that the Respondent was not attending the Professional Learning Time conferences conflicts with her written statement. She testified that she was not specifically looking for the Respondent, but in Respondent Exhibit 6, she stated that she excused herself from a meeting to look for the Respondent.

The Respondent also argues that AP Stark's recollection of events cannot be credited in many instances, noting the previously mentioned example of AP Stark claiming a meeting in

February of 2017, when the documentation shows that it took place on March 8, 2017. Similarly, AP Stark stated that the Respondent's chapter leader was not at any meeting prior to April 4, 2017. However, Respondent Exhibit 7 shows that Mr. Myer was present at the March 15, 2017 disciplinary conference. He also changed his testimony that the Parent Teacher Conference issue was not discussed at the March 15, 2017 conference. The logbook shows that AP Stark was incorrect about visiting the Respondent on a professional development Monday. The only Monday on which AP Stark visited the school was on February 6, 2017. Finally, AP Stark extended the truth as to when the Respondent was late. Department Exhibit 7 shows that the Respondent punched in before 8am on all the days in March when AP Stark signed the logbook before 8am.

As to Specification Three, the Respondent highlights Respondent Exhibit 6, wherein the principal acknowledged that she had not officially assigned the Respondent to any one grade during this time. Further, there is a suggestion in principal's own words that the Respondent would not have benefitted from Monday Professional Learning Time. Despite this, the Respondent took appropriate steps to find out where she should report during Monday PLT. She got her direction from the payroll secretary. The principal stated that the Respondent could speak to the payroll secretary about which, if any, professional learning to attend. On rebuttal Ms. Scoufaras did not recall whether the Respondent asked her about professional development assignments. If the payroll secretary gave the Respondent her daily assignment, the administration had every opportunity to tell her where to go. An absence of such instruction is on the administration.

The Respondent testified that she was given no particular instruction but that the payroll secretary confirmed that the Respondent could go to the teachers' lounge. If the payroll secretary

was relaying this information, it is a directive from the administration.  Even if she had asked the principal, it is likely she would have received the same instruction as Principal Errico testified she did not know the specific mandates for ATR teachers in regards to professional learning time.  The principal did not know until April 4, 2017 whether ATR teachers were required to attend professional development.  Had the administration directed her to attend, she would have complied. The principal admitted that if the Respondent was not on the list serve, she did not know if there was another way she would know which cohort or which professional cycle was being shared that week.

The Respondent further maintains that the principal was aware that the Respondent had not attended professional learning time prior to March 9, 2017. While this statement conflicts with other evidence, if it was true, then the statements in Respondent Exhibit 6 are misleading and inaccurate.  If she had knowledge, the principal could have just directed the Respondent to attend a specific professional learning session on Mondays.

In addition, Respondent Exhibit 3 shows that other teachers did not attend Monday professional learning and there is no evidence to suggest that those teachers were disciplined. Further, she should not be disciplined for the April 3, 2017 PLT because the administration was aware of her non-attendance, but still did not assign her a specific session.

The Respondent notes that there has been no investigation of any of the allegations in this case.  There were no written statements.  Had an investigation been conducted, more accurate information, closer in time to the alleged incidents, would have been obtained.

Because the Department has not proven Specifications One through Four, Specification Five must also be dismissed.  The Respondent would note, however, that to the extent Specification Five references Respondent's growth as a teacher, AP Stark's testimony

demonstrated that they had met every benchmark they set that year, thus demonstrating her growth.   It appears that the Respondent benefitted from AP Stark's supervision and that he seemed to think very highly of her.

When one considers the Chapter Leader's testimony that Principal Errico did not like ATRs, one sees that the Respondent was placed in an unwinnable situation. She was treated as an outsider from day one which accounts for the administration failing to give her direction as to professional development or the Parent Teacher Conference.

The Respondent submits the cases of DOE v. S.H., SED No. 18863 and DOE v. J.Y., SED No. 29325, which stand for the proposition that the existence of prior penalties in 3020-a matter does not necessitate a penalty of termination in a new 3020-a case.

The Respondent maintains that these charges were brought against her mainly because the Department did not appreciate a New York Times article which mentioned her. The Department's motivation was an attempt to respond to the Times article. However, the evidence in this case shows that discipline was not justified, and the charges should be dismissed.


### Factual Background

The Respondent testified that she has worked for the Department for 26 years. She holds a special education and Nursery-Grade 6 license. T. 594. She has been a teacher in the Absent Teacher Reserve (ATR) for the last seven years. During the 2016-2017 school year, she was assigned to a number of schools, including PS 32 for the period from February 6, 2017, through April 23, 2017. T. 178. Her supervisor, Assistant Principal Justin Stark, testified that each year, he met with the ATR teachers whom he supervised, and reviewed expectations and employment resources.   While he worked with the Respondent as her supervisor, when she was in a school

building, the school's building leader also functioned as her supervisor.  He noted that the Respondent was on a plan of assistance due to an unsatisfactory rating the prior year. a fact acknowledged by the Respondent. T. 175-178, 748. AP Stark averred that the expectations for a teacher in the ATR are the same as those for any other teacher working for the Department. She is expected to perform all the duties as a teacher during the school day. T. 180.

Debra Errico, the principal at PS 32, testified that the ATR teacher will check in with the payroll secretary who assigns the duties for the day. While the principal testified that ATR teachers receive the weekly calendar/newsletter, as well as the school's protocols, and are added to the school's e-mail, it was clear that the Respondent did not receive the weekly calendar via e-mail. According to Respondent Exhibit 10, it did not appear that her name had been placed on the list serve during her time at the school. T. 40-44. Principal Errico stated that ATR teachers also receive the information via morning announcements on the intercom. The Respondent testified that when she was assigned to PS 32, she was the only ATR teacher at the school and she received no written policies upon her arrival.  She received no weekly e-mails. She was not given access to the teachers' Shutterfly account. T. 594-596. While the Respondent liked Mr. Stark, and felt that he was helpful and fair, she did not feel Principal Errico very friendly. T. 593, 596. The union representative at the school told her that Principal Errico did not like ATR teachers and was not responsive to them. As a result, the Respondent was hesitant to approach the principal.  Most of the time, she got her direction from the payroll secretary. T. 597-598. The Respondent stated that she felt "set up" at PS 32 because everything had been going so positively before she was assigned to that school.  Around the end of February, she asked Mr. Stark if she could be transferred T. 592-593. The record demonstrates that Principal Errico also asked in late March if the Respondent could be removed from the school. Respondent Exhibit 6.

15

**Specifications One and Two – Allegations concerning the Respondent's alleged failure to attend the March 9, 2017 Parent Teacher Conference.**

At the end of the Department's case, the Respondent moved to dismiss Specifications One and Two, asserting that the Department had failed to establish a prima facie case. In support of its motion, the Respondent argued that in Department Exhibit 5, the April 6, 2017 disciplinary letter, the principal credited the Respondent's account that she was in the auditorium during the evening Parent Teacher Conference Session. She wrote: "During Parent Teacher Night you failed to engage on any action related to the evening events, instead secluded yourself with a book in an area where teachers and parents were not located." The Respondent submits that Principal Errico's testimony supports this argument. The principal testified that she did not give the Respondent an assignment, nor did the Respondent ask. T. 79.   When the principal inquired of the Respondent where she was, the Respondent said she was in the auditorium.   The principal testified: "She might have been sitting there in the dark, but all the doors were closed and it was dark." T. 79.   Based on the record before me, the Department has presented sufficient facts to set forth a prima facie case that the Respondent failed to attend the Parent Teacher Conference.

The April 6, 2017 letter charges that the Respondent was derelict in her professional responsibilities to engage in mandated activities by failing to engage in any action related to the evening events. At issue is whether the Respondent's purported action in sitting in the auditorium during the Parent Teacher Conference was tantamount to a failure to attend.   In its case, the Department presented the testimony of Principal Errico, two teachers whom the Respondent claimed were present and saw her in the auditorium, as well as two paraprofessionals who were referenced by the Respondent's union representative as having pertinent information. The facts as presented through these witnesses were sufficient to state a claim.

16

While this specification speaks generally to the Respondent's failure to attend the Parent Teacher Conference (PTC), at the hearing, the Department's case focused on the Respondent's alleged failure to present herself at the evening portion of the conference. Principal Errico testified that all professionals are required to be present at the schools for PTC. According to her, the Respondent never asked, and the principal never told her what her assignment was to be that day.   T. 79. Principal Errico explained that there were a number of ways by which a teacher would be notified of the PTC, including parent notification, posters and flyers, as well as announcements. T. 75. Maria Scoufaras, the payroll secretary testified that the date of the PTC was general knowledge. T. 404-406. AP Stark testified that he advised the Respondent on September 19, 2016 of her obligation to attend the PTC. T. 238. The Respondent was expected to be at both sessions. T. 78. Ms. Scoufaras testified that she had no recollection of the Respondent asking her anything about the PTC. T. 360.

When the principal inquired of the Respondent where she was during the PTC, the Respondent told her she was in the auditorium reading a book for both the morning and the evening sessions. T. 86. The Respondent mentioned that the music teacher and the drama teacher were also there. She said they could attest to the fact that she was there for both sessions. T. 98, 105.

Principal Errico concluded that the Respondent was not in attendance for the evening session of the PTC.  When she walked by the auditorium, the room was dark. The people the Respondent claimed were also in the auditorium were in the main office. T. 105-106. In reviewing the April 6, 2017 disciplinary letter, she testified that she asked the Respondent specifically where she was during the evening session.  She believed that the Respondent named teacher Hoffman. Principal Errico said the Respondent was present, but secluded herself

with a book in an area where teachers and parents are not located. T. 117-120. Principal Errico did not conduct an investigation. She herself observed the auditorium to be dark when she was walking around the building. T. 121.

Robert Hoffman, a music teacher at the school, testified that during the afternoon session he was in the auditorium meeting with parents. Ms. Binkley, the drama teacher, was also there. T. 412. No one else was in the auditorium. T. 412. During the evening session, he was in the main office on the second floor above the entrance. The auditorium is on the opposite end of the building on the first floor. T. 414-415. Ms. Binkley, the drama teacher, was in the main office with him – meeting with parents and helping out with the phones. T. 415-416. He did not have a conversation with the Respondent on March 9, 2017. T. 420. He further averred that he went into the auditorium after the evening session of the conference to pick up his belongings. T. 421. When he arrived there, the lights were out and it was dark. T. 421.

Lisa Binkley testified that she was with Robert Hoffman during the PTC - in the auditorium in the afternoon, and in the main office during the evening session. T. 435-436. She testified that no one else was with them in the auditorium during the afternoon session. T. 436. She had no conversation with the Respondent on March 9, 2017. T. 444.

Stephanie Klein and Valerie Gorelkin, two paraprofessionals at PS 32 denied that they told the Respondent that the faculty lounge was in use. T. 523-524.

The Respondent testified that she knew there were parent teacher conferences on March 9 2017, because she saw something about it on the wall of one of the classrooms. She approached the payroll secretary during her lunch or prep period and asked where they needed her. According to the Respondent, she was told to go to the teachers' lounge, but returned to Ms. Scoufaras when told by paraprofessionals "Stephanie" and "Valerie" that she could not stay

there.  At that point, she was told to go to the auditorium. T. 599-600.  Apart from those two conversations, the administrators did not tell her to do anything. T. 602. They did not tell her what to do during the evening session. T. 602.

The Respondent testified that she was in the auditorium during the evening session. T. 604.  Although she saw Mr. Hoffman during the afternoon conference, she did not recall seeing anyone else when she was in the auditorium during the evening session.  There was nothing going on.  She read a book. T. 604-606.  She stated she was bored, but she knew the requirement that she be there. T. 606. She denied telling Principal Errico at the April 4, 2014 disciplinary meeting that Ms. Binkley was in the auditorium during the evening session. T. 609.

In her recording of the March 15, 2017 disciplinary meeting, the Respondent is heard saying that she was there in the auditorium "and the assistant principal saw me at the end when I was leaving – 7:30." T. 647.  Her union representative, Mr. Myer, is heard stating that Stephanie or Valerie told her that she could go to the office or somewhere so she went to the auditorium. T. 649. He also argued that Mr. Hoffman would have seen her the whole time. In the evening he was there as well. Mr. Myer asks the Respondent "So he saw you?" To which the Respondent answers "Yeah, in the auditorium. T. 650."  The Respondent is heard on the recording of the April 4, disciplinary conference stating: "I was there in the evening." Principal Errico responds that Mr. Hoffman was not in that location during the evening session. The Respondent stated that she sat in the back. The principal then queries: "By yourself in the dark?" The Respondent replied: "I just sat there. I took my book out and I just read. I don't remember it being dark in there." T. 675-676. The principal is then heard to ask whether at any point the Respondent sought out an administrator or somebody to ask how you could be of assistance or support throughout the day. The Respondent states: "No every other time that I've had to attend, I think

one time they had me give out surveys and every other time they just said just be in the building and that's it. I did not hear my name announced. I didn't hear anybody looking for me." T. 677.

The Respondent told Principal Errico that she had been told in every other school just to be in the building so that they know where to find her if they needed her. She sat in the building. T. 678.   Principal Errico advised the Respondent that it was her professional responsibility to be seeking and asking if she could be of assistance. T. 680.

The Respondent admitted on cross examination that she was aware that Parent-Teacher Conferences were a contractual obligation for teachers. T. 762. As to the afternoon conference, she did not recall if Mr. Hoffman was in the auditorium in the beginning, or if he came in later. T. 769.  She admitted that there were no conferences going on in the auditorium in the evening, and that she did not see Mr. Hoffman during the evening session. T. 774, 779. She did not ask where she could help out during the Parent Teacher Conference. T. 774-775. She admitted that by sitting in the auditorium, she was not helping. T. 780.

As part of its rebuttal case, the Department called Assistant Principal Menkes, who testified that she did not recall seeing the Respondent leave the auditorium during the evening session, as the Respondent had asserted at the disciplinary conference. T. 892. Ms. Scoufaras testified on rebuttal that she did not recall her coming to her desk to ask where she was needed. She would not tell her automatically to go to the teachers' lounge. She would ask someone from the administration where the teacher should go. She never told her to go to the auditorium. T. 895. The Respondent never approached her about the evening session, because she would not have been there. Ms. Scoufaras did not work during the evening session.

Opinion

As to these specifications, a determination must be made as to whether the Respondent

was told to spend the PTC sitting in the auditorium, or whether she failed to seek guidance and failed to attend the PTC. For the reasons set forth below, I find the Department has sustained its burden and has demonstrated that it is more likely than not that the Respondent failed to attend the evening session of the March 9, 2017 PTC.

I credit the testimony of Ms. Scoufaras that she would have approached the administration if the Respondent had, in fact, asked her where to report for the PTC. I found Ms. Scoufaras a credible witness who candidly testified if she did not recall something.

I note that the Respondent's story differed from that which she wrote in her rebuttal letter. While she stated in detail that when she inquired during either her lunch or prep period where to go for PTC, she was told to go to the teachers' lounge. The Respondent then stated that she was informed she could not stay there and returned to the office, where she claimed she was told to go to the auditorium. Her rebuttal letter dated April 6, 2017 the Respondent wrote: "I was given no directive for either the afternoon or evening conference except 'to be in the building.' I did go to the office for the afternoon conference to ask if I was needed for anything and I was told 'No, just remain in the building.' I remained in the building as advised and easily could have been found by intercom that works throughout the building." Had the Respondent, in fact, spoken to Ms. Scoufaras twice concerning her assignment for the PTC, it stands to reason that the Respondent would have mentioned this in her rebuttal letter.

Additionally, I credit the testimony of Mr. Hoffman and Ms. Binkley that they did not see the Respondent during both the afternoon and evening sessions. They were forthright and had no apparent bias or motive to fabricate.

I also note that it is illogical that the administration would have had the Respondent sitting in the auditorium during the evening session while Mr. Hoffman and Ms. Binkley, both of

whom would also have been required to meet parents, were answering phones. Had the Respondent sought direction for the evening conference, it makes no sense that she would have been directed to sit in a dark auditorium. This along with the fact that the Respondent did not mention seeking direction or assignment for the evening conference in her rebuttal letter provides further evidence that the Respondent did not attend the evening session.

Finally, Principal Errico testified that the auditorium doors were closed and the lights were off.  This testimony was corroborated by Mr. Hoffman when he testified that he returned to the auditorium to find it dark. I further note that, by her own admission, the Respondent did not ask where she could help out, and by sitting in the auditorium, she was not helping. All told, concerning the evening session, I find the Respondent did not report for an assignment, and whether the Respondent was not in the building, or sitting in the auditorium, the Department has proven that the Respondent failed to attend the evening Parent Teacher conference. Specification One is sustained.

As to Specification Two, this specification states that the Respondent falsely stated that she was present in the auditorium during Parent Teacher Conference when she was not.[2] The Respondent is correct that in the April 6, 2017 letter, Principal Errico seemed to credit the Respondent's statement that she was in the auditorium. While it is clear that the Respondent did not report to the evening session, and thus failed to participate, it is less clear that she lied as to her whereabouts. Therefore, the Department has failed to sustain its burden of proof and Specification Two is dismissed.

**Specification 3 – Allegations concerning failure to attend professional development meetings.**

---

[2]  The facts demonstrated that the Respondent claimed she was in the auditorium during the Parent Teacher Conference at the April 4, 2017 disciplinary meeting, not on March 9, 2017.

22

The Department alleges that the Respondent failed to attend Professional Learning Time (PLT)[3] on eight Monday sessions during her time at PS 32. Under the collective bargaining agreement, teachers are required to participate in PLT.  T. 58. The teachers' day is extended from 2:20 to 3:40 on Mondays to provide dedicated time for professional development. T. 56.

Principal Errico testified that teachers are advised as to the expectations for Monday professional development in September. T. 54. She was advised by AP Stark that ATR teachers were expected to attend professional learning time. T. 55. The Respondent would be responsible for attending all the Monday sessions conducted when she was assigned to PS 32. T. 64. If an ATR teacher had questions as to professional learning time, she needed to seek advice or to have her questions answered by the administration. The Respondent never contacted Principal Errico about her PLT. T. 65.

Principal Errico discovered that the Respondent was not attending when she saw the Respondent in the teachers' lounge during professional learning time. The principal testified that she asked the Respondent why she did not attend professional learning time, to which the Respondent replied that she attended the "first one," but the principal at her prior school told her not to go, so she spent the time in the teachers' lounge. T. 96-97. Principal Errico concluded that the Respondent did not meet her professional responsibilities because it was the Respondent's responsibility to be in attendance on Mondays to grow her knowledge and to support students. T. 97-99.

The Principal admitted that she saw the Respondent in the teachers' lounge prior to March 9, 2017, and knew that she did not go to every PLT session prior to March 9, 2017, but

did not speak to her about it until April 4, 2017. T. 129. The Respondent told her she spoke with Ms. Scoufaras about professional learning time, but that would have been impossible because Ms. Scoufaras left the school before PLT began. T. 160.

AP Stark testified that, as to professional development, the Respondent was on a plan of assistance due to an unsatisfactory rating the prior year. T. 193. The document, outlining steps and strategies the Respondent was to take to improve her pedagogy, was given to her on October 7, 2016. T. 196. Department Exhibit 12. The second page notes "Participation in professional development activities at your assigned schools." AP Stark testified that he wanted the Respondent to understand that she was expected to participate in the professional development activities at her school. T. 199. The witness testified that he made the Respondent aware that she had a contractual obligation to participate, in addition to participation being part of her instructional supports in her plan of assistance T. 206. After receiving an e-mail from Principal Errico on March 8, 2017, he visited the school the following day to meet with the principal. He advised her that the Respondent was expected to attend professional development and he had communicated this to the Respondent. T. 214. He met with the Respondent thereafter and spoke with her about professional development. The Respondent told him she was always at the school building when she was supposed to be there. T. 214. He told her she was to make sure she was assigned to a professional learning time session, and if she was not sure, she should go to the office and find out her assignment. The witness testified as to an earlier incident where he met her once in the teachers' lounge when professional development was going on. The Respondent told him she did not receive an assignment, so she did not know where to go. AP Stark told her she could go to the office and find out from administration or the payroll secretary which she

---

[3] Throughout the hearing, the terms Professional Learning Time and professional development were used interchangeably.

supposed to attend. T. 219. He advised the Respondent to be proactive. T. 240. During the conversation, the Respondent again stressed that she was in the building but not given an assigned location, so she stayed in the teachers' lounge. T. 244. She also told AP Stark that she attended professional development the first week she was at the school. T. 246. He reminded her she was obligated to attend per the contract. T. 247.

Maria Scoufaras testified that she had no recollection of the Respondent asking her anything about professional development. T. 360.

The Respondent testified that prior to April 4, 2017 disciplinary conference, she had not been instructed to attend PLT on Mondays at PS 32 except for the first "getting to know you" session held the first day she was at the school. T. 610. She stated that she approached Ms. Scoufaras and asked her where they needed her for professional development, and she was told nowhere in particular. She was not sure if Ms. Scoufaras asked, or she brought it out, that in many schools, she had been told to sit in the teachers' lounge, so she could be found if needed. She was told by Ms. Scoufaras to do that. T. 611. This conversation took place on more than one occasion. T. 611. She did not know if there came a point when she stopped asking Ms. Scoufaras where she should be during professional learning. It became routine that that she would go to the teachers' lounge. T. 612-613.

On cross examination, the Respondent stated she did not know if AP Stark covered attendance to professional development activities. T. 743. She admitted, however that the plan of assistance stated that she had to participate in professional development at her assigned school and that it was an important part of a teacher's pedagogy and a requirement under the collective bargaining agreement. T. 752, 793, 824. In the recording of the April 4, 2017 disciplinary conference, the Respondent is heard saying that in "Every other school I have been in, this is

what I have always been told, is just 'Be in the building, sit in the teacher's lounge, so we know where you are if we need you.'" T. 804.   The Respondent admitted that she had to ask someone about the initial "getting to know you" PLT session, and that many of the topics covered were considered to be about Danielson's Framework. T. 823, 829. She agreed that some of the topics would apply to her as a teacher, but she was not told to go. T. 830. "I didn't make the decision where to go – I was told by the payroll secretary." T. 830-831. The Respondent insisted that she was told where to go and did not make the decision not to go. While she admitted that she could have taken the initiative to find professional development, she stated that she followed what I was told to do. T. 834. The Respondent also mentioned that on occasion, she was told to take her prep period during professional development or parent engagement times. T. 843.

As part of the Department's rebuttal case, Tiffany Davis, who was the principal of PS 165, denied that the Respondent was told that professional development did not apply to her, that she was directed to do things unrelated to professional development, or that anyone on her staff directed her to go to the teachers' lounge during professional learning time. T. 865-866. Ms. Scoufaras denied ever telling the Respondent to go to the teachers' lounge. T. 896. Because she leaves at 2:20, if the Respondent had approached her she would probably ask someone in the administration where the Respondent should report. She did not recall telling her just to be in the building during professional learning time. She was "pretty sure" that she would not have said that because she would have gone to the administration and asked them what she should be doing. She did not make decisions like that. She also did not recall telling the Respondent to take her prep time during professional learning time. T. 897. Frederick Wright was the principal at PS/MS 219, where the Respondent was assigned for one and one-half weeks during the 2016-2017 school year. He testified that he never directed the Respondent to do things unrelated

to professional development during professional development time. Everybody is expected to do the same things. T. 903-904. Finally, Dr. Mary McDonnell, the principal of PS 209, testified that the Respondent was assigned to her school during the 2016-2017 school year and that she never directed the Respondent to stay in the teachers' lounge during professional development. Neither she, nor anyone in her staff would have allowed her to "just remain in the building." T. 915.

Opinion

With the exception of February 6, 2017, which would have been the first PLT session to which the Respondent could have been assigned, there is no dispute that the Respondent did not attend the professional learning time sessions on the days alleged. The questions are whether the Respondent was advised to spend the Monday Professional Learning Time in the teachers' lounge and assuming she was so advised, whether that excuses her conduct.

There was testimony as to the manner in which the school communicated or failed to communicate with ATR teachers. Principal Errico was confident that the Respondent was on the list serve, but later testified that she had assumed that AP Menkes had placed her e-mail on the list. Clearly, the Respondent was not e-mailed the weekly newsletter. Despite this, the record reveals that the Respondent was fully aware that PLT was conducted on Monday afternoons. She claimed that she attended the first PLT on February 6, 2017, as directed. Thereafter, the Respondent claimed that, at her suggestion as to what was done at other schools, Ms. Scoufaras directed her to spend the time in the teachers' lounge. Ms. Scoufaras denied telling the Respondent to do this, and stated that she would have sought direction from the administration. I credit her testimony.

The Respondent is a twenty-six year veteran teacher. She was on a plan of assistance during the 2016-2017 school year due to deficiencies in her pedagogy the preceding year. This

plan explicitly required her to attend professional development at her assigned school. She knew that she was required to attend professional development pursuant to the plan and the collective bargaining agreement. She provided no reasonable explanation as to why she did not seek out the advice of the administration directly. Her feeling that Principal Errico did not like her was no excuse. She gave no reason why she did not speak to AP Menkes. Even more notable, she did not seek direction from AP Stark, a person whom she testified was fair. It was AP Stark with whom she was working to improve her pedagogy and he was the logical person to approach in order to receive direction. She did not. Instead, she neglected her professional responsibilities and sat out the period in the teachers' lounge.

I have considered the Respondent's defenses that the principal was aware that the Respondent was not attending professional development, and that there were other teachers at the school who also did not attend. These defenses are not compelling. The Respondent was under an affirmative duty to attend professional development. The principal's failure to address the situation immediately, based on the circumstances here, does not present a situation where it fairly may be interpreted that she condoned the Respondent's actions. Further, even if the other teachers did not attend a professional development session on a given Monday there is nothing in the record to show that the principal systemically excused teacher non-attendance. Moreover, her plan of assistance gave the Respondent a unique obligation to attend professional development. The actions or inactions of others cannot serve to relieve her of this responsibility. As to the Respondent's claim that she attended the February 6, 2017 session, I have thoroughly reviewed the sign-in sheets for the PLT sessions, and her name appears nowhere. I do not credit her testimony that she attended. Specification Three is sustained.

### Specification Four – Allegations concerning the Respondent's alleged failure to punch in when late on three dates in March, 2017

The Respondent also seeks dismissal of Specification Four, arguing that to sustain this charge, the Department must in the first instance demonstrate that the Respondent was late and it has failed to do so. The Respondent maintains that payroll secretary was unable to state that the Respondent was late. Further, a comparison of the visitor's log book (Department 19) demonstrates that Mr. Stark was not present at the school on the dates in question. No one testified that they witnessed the Respondent arriving late. Thus, this specification should be dismissed.  In support of this specification, the Department argues that the Respondent had an issue with tardiness well before March, 2017. Further, the payroll secretary testified that the Respondent would arrive a school in a rushed, hurried manner, indicating that she was late.

In reviewing the record of the Department's case concerning this specification, Principal Errico testified that the school day began at 8:00am, and ended at 2:20pm, except for Monday when it went to 3:40pm and Tuesday when it went to 3:35pm. T. 83.  Time and attendance were tracked by the payroll secretary.  The teachers did not punch in, but flipped their timecard to note their attendance. There was no expectation that the Respondent punch in when she first started at PS 32. T. 138. The Principal testified that the Respondent developed a pattern of lateness, including one time when AP Stark came on a day when she had arrived late to school. The Principal and Mr. Stark had a discussion and the Respondent was asked to punch in moving forward. T. 89-90. Principal Errico stated that she was not sure of the date when she asked her to punch in.  She knew it was following other lateness and after a discussion with both herself and Mr. Stark. She was not sure if the date was after March 15, 2017. T. 137.

The Principal admitted that she did not obtain any statements concerning the Respondent's alleged lateness on March 2, March 6 and March 7, 2017. She assumed that the Respondent was late on those days because she did not punch in. She was shown an e-mail dated

March 15, 2017, in which AP Stark mentioned that the Respondent would punch in going forward. T. 132. The Principal also acknowledged the Employee Information Statement (EIS), which was maintained by the payroll secretary and which tracked the Respondent's time and attendance, had no indication that the Respondent was late on the days in question. T. 159-160, Respondent Exhibit 4.

AP Stark testified that approximately two days after the meeting with Principal Errico to discuss the Respondent's lateness, he met with the Respondent. He stressed to her that if she was late, she was required to punch in because she had to verify the lateness.  She said she was giving her best effort to be on time, and understood that if she was late, she would have to punch in. AP Stark stated that at the meeting, the Respondent started to discuss punching in everyday as a way to verify her arrival so there is no question as to her attendance. T. 211-212. AP Stark testified to an e-mail from the principal dated March 8, 2017. T. 213. He visited the school the following day to meet with the principal who said that the Respondent was late (or could not be located in the building) at the start of the day. T. 213. He again spoke to the Respondent about lateness.  He told her if she was not reporting on time, she would have to verify her arrival by punching in. T. 216. It was his understanding that she reported late three times in March. T. 224. If she was late, she was to punch in and await her assignment. T. 224.

On cross examination, AP Stark admitted that he was not sure if prior to March 15, 2017, the Respondent was required to punch in. T. 281-282. He never told her between February 17, and March 15 that she should punch in if she was late. Nor was he present at any conversations between the Respondent and the principal.  He recalled no other e-mail apart from the one he sent on March 15, 2017, stating that she would be required to punch in going forward. T. 283. He denied first-hand knowledge as to whether Respondent was late on any day earlier in March,

though there were two occasions when he arrived at the school and she was not there, but he did not recall if they were in February or March. T. 287. He was informed by the payroll secretary that she had been absent three times in March. T. 288. After March 15, 2017, Respondent complied with the directive to punch in. T. 305.

Payroll secretary Maria Scoufaras testified that among her duties was to track the lateness and absence of staff. T. 353-354. If a teacher was absent, she would note it in EIS. The witness corroborated Principal Errico's testimony that teachers were not required to punch in – they flipped the time card from one side to the other to show their presence. T. 356. When an ATR teacher arrived at school, he or she generally came to her desk for the assignment of the day. The assignment was made by Assistant Principal Sue Menkes. T. 357-358. The Respondent always came in around "8-ish" 359-360. In response to a question as to whether the Respondent was late on March 2, March 6 and March 7, 2017, Ms. Scoufaras stated: "I can't honestly specifically say that on those days she came in late or was on time." T. 369.   She did not recall when Principal Errico told her that the Respondent had to punch in. T. 393. She admitted that none of the Respondent's lateness were documented in EIS. T. 404.

Based upon this record, the Department has failed to prove a prima facie case. There is simply no reliable evidence that the Respondent was late on March 2, March 6, or March 7, 2017. The payroll secretary, the individual charged with maintaining records as to time and attendance could not honestly say whether the Respondent was late on the days in question. The EIS records, admitted as Respondent's exhibit, but through a Department witness, have no record of the Respondent being late on the days in question.

Of note is the fact that the Respondent was not charged with lateness, per se, but with failing to punch her timecard after being late on the days in question. The Department has been

unable to demonstrate that the Respondent was given a directive to punch in prior to March 2, 2017. Whether she punched in prior to that date is not the issue. The salient questions are on what date she was directed to punch in, and did she fail to do so thereafter. Although there was general testimony that AP Stark was at the school prior to the February break, the record demonstrates that the directive was given after the dates in question, as confirmed in AP Stark's e-mail of March 15, 2017.

The Respondent's motion is granted.

**Specification 5 – Allegations concerning the impact of the Respondent's actions**

This specification speaks to the impact of the Respondent's alleged conduct. The Department alleges that the Respondent created an undue burden on the school and/or staff and/or prevented Respondent from service and/or growth as a teacher and/or had a disruptive and/or negative impact on her workplace. In support of the specification, the Department presented testimony from both Principal Errico and AP Stark concerning the effect of the Respondent's actions.

Principal Errico testified that the impact of a teacher not being at the Parent Teacher conference was that she could have been supportive in other ways, even if she did not have interactions with parents. T. 107-108. AP Stark stated that any teacher assigned to the building is useful promoting an environment of professionalism and care for the parents. T. 253. As to the failure to attend professional learning time, Principal Errico stated that teachers have to be constantly learning to support students anywhere, and it limited the Respondent's ability to integrate into the school culture. T. 108-109. AP Stark testified that by failing to attend professional learning time, the Respondent was limiting her own access to new techniques,

limiting her learning and limiting her ability to learn what is currently happening at the school. T. 257-258.

Specification Five does not allege new or different conduct. It speaks to the impact which the Respondent's alleged misconduct had upon the school community. That impact can be an important consideration when determining an appropriate penalty for the misconduct which has been proven. However, standing alone it is essentially duplicative of the prior specifications and is therefore dismissed.

### Penalty

As previously noted, the Department seeks the Respondent's termination. The Respondent urges a lesser penalty to address the conduct for which she has been found guilty. In determining an appropriate penalty, various factors must be taken into account. The nature of the misconduct, the impact which the misconduct has upon the Department, school or individuals, the years of service of the Respondent and the Respondent's prior disciplinary history are all considerations which must be assessed and balanced.

The Respondent has worked for the Department for a considerable amount of time – twenty six years. The Respondent also has a significant disciplinary history. In 2009, the Respondent entered into a Consent Award before Arbitrator Riegel wherein she agreed to pay a $1,000 fine to address charges related to absenteeism and lateness during the 2007-2008 school year. In 2010, the Respondent entered into a Post-Charge Stipulation of Settlement wherein she agreed to pay a $2,000 fine concerning time and attendance charges during the 2008-2009 school year. In 2012, Arbitrator Crangle issued a decision fining the Respondent $7,000 to address two sets of charges. The first concerned the Respondent taking sick time when she was at a family

reunion in Chicago in 2010, and the second concerning her failure to report two arrests in 2011. In 2014, Arbitrator Ginsberg suspended the Respondent without pay for thirty days concerning conduct related to her pedagogy during the 2010-2011 and 2012-2013 school years.

In her decision, Arbitrator Crangle wrote that she decided to afford the Respondent the benefit of another opportunity to demonstrate that she could comply with the legitimate expectations of the Department. *Respondent must be cognizant of the fact that her conduct will be closely scrutinized and any further attendance related violations, failures to adhere to Chancellor's Regulations, or other unacceptable conduct will surely result in more severe penalties including termination.* Department Exhibit 21 at page 14.

In his decision, Arbitrator Ginsberg quoted extensively from Discipline and Discharge in Arbitration concerning well established concepts of progressive discipline and fairness in arbitration. Of note is the authors' observation that: *Where discharge is the final step in the progressive discipline process, the employee will usually have received several warnings and often at least one suspension.* Department Exhibit 22 at page 225.

While arguably the conduct for which the Respondent has been found guilty may be viewed as not particularly egregious, in the overall circumstances of this case, and the Respondent's overall disciplinary record, the Respondent's conduct is highly troubling. Despite her long tenure and deficiencies in her pedagogy, she refused to take the initiative or responsibility of attending the professional learning time at PS 32 as she expressly had been directed in her Plan of Assistance. She failed to attend the evening session of the March 9, 2017 Parent Teacher Conference, despite the fact that she was aware that her attendance was mandatory. This, coupled with her prior discipline, which encompasses both misconduct and incompetency, demonstrates to me that the Respondent has not benefitted from the numerous

chances she has been given to comport her conduct as befits a professional. She has received progressive discipline and ample notice that there would be consequences to unacceptable conduct. Therefore, the Respondent is terminated from her employment with the Department of Education.

## AWARD

i)      Respondent is guilty of Specification One and Specification Three.

ii)     Specifications Two, Four and Five are dismissed.

iii)    The appropriate penalty for the specifications of which Respondent has been found guilty is termination of her employment with the Department of Education.

Queens, New York
June 1, 2018

Mary J. O'Connell, Esq.
Hearing Officer

STATE OF NEW YORK)
                              ) ss.:
COUNTY OF QUEENS )

I, Mary J. O'Connell, do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

June 1, 2018

Mary J. O'Connell, Esq.

**EXHIBIT C**



**Department of Education**

## D E L E G A T I O N

To:        Principals of High Schools, District 75 Schools, Transfer Schools, District 79
           Programs, District 88 Programs

From:      Richard A. Carranza
           Chancellor

Re:        Delegation to Appoint Assistant Principals, Consult with School Leadership
           Teams, Appoint Non-supervisory Employees, and Initiate Disciplinary Charges

Pursuant to Education Law§ §2590-h(19) and 3020-a, I hereby delegate to you the authority to:

1. Select and appoint assistant principals in your schools and consult with the school leadership team prior to appointing assistant principals;

2. Appoint, define duties of, assign, promote and discharge all non-supervisory employees in your schools, subject to the terms of any applicable collective bargaining agreements;

3. Recommend discontinuance, denial of completion of probation and appointment on tenure of your pedagogical staff to your superintendent;

4. Initiate and resolve disciplinary charges against teaching and supervisory staff members in your schools who have completed probation, and recommend suspension of such employees to the Chancellor.

Dated: 4/2/18

Richard A. Carranza